**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| DUKE MIGLIN, | ) | Bankruptcy No. 04 B 42614 |
| | ) | |
| Debtor. | ) | Judge Jack B. Schmetterer |

**PETITIONING CREDITOR KATHLEEN HIRSCH'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Kathleen Hirsch, by and through her attorneys, O'Rourke Katten & Moody, submits the

following proposed findings of fact and conclusions of law pursuant to this Court's final pretrial

order:

**FINDINGS OF FACT**

1.      Kathleen Hirsch ("Hirsch") is a citizen of the State of New Jersey. [Exhibit H-8 at

¶ 1]

2.      Duke Miglin ("Duke") is a citizen of the State of Illinois. [Exhibit H-3 at ¶ 2]

3.      This Court has jurisdiction over this case since it is a core proceeding for this

Court to adjudicate an involuntary petition. In re Harman, 243 B.R. 671, 674 (Bankr. N.D. Tex.

1999) (citing 28 U.S.C. § 357(b)(1) and 1334). [Exhibit H-8 at ¶ 2]

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408(1). [Exhibit H-8 at ¶

3]

5.      On November 17, 2004 (hereinafter the "Petition Date"), Hirsch filed a Chapter 7

involuntary petition against Duke pursuant to 11 U.S.C. § 303 of the United States Bankruptcy

Code. [Exhibit H-8 at ¶ 4]

6.      On December 7, 2004, Duke filed a motion to dismiss the involuntary petition alleging that he had more than eleven creditors on the Petition Date.

7.      On December 13, 2004, Duke filed a verified Schedule F listing his alleged creditors as of the Petition Date. [Exhibits H-1, H-8 at ¶ 5]

8.      On April 1, 2005, Duke was granted leave to file an amended motion to dismiss and he again alleged that he had more than eleven creditors on the Petition Date.

9.      The only issue for this trial is whether Duke had more than eleven creditors on the Petition Date. (Order dated June 3, 2005).

<h2 style="text-align:center">DUKE'S ALLEGED CREDITORS</h2>

<h3 style="text-align:center">Allstate Insurance Company [No Debt Owed]</h3>

10.      Duke contends that Allstate Insurance Company ("Allstate") is a creditor by virtue of a homeowner's insurance policy, policy number 0 37 718093 5/01, for the property located at 428 Carroll Canal, Venice, California ("the Policy"). [Exhibits H-5 at ¶ 1, H-8 at ¶ 14, H-22 at page 10, lines 4 through 8]

11.      The $1,172.00 listed on Duke's Schedule F was paid to Allstate prior to November 17, 2004. [Exhibit H-4 at ¶ 7]

12.      A payment of $1,172.00 was made by check number 6223, dated April 22, 2004, from the Marilyn Miglin trust account signed by Duke to Allstate for the claim listed in Duke's Schedule F and covered the policy period from May 1, 2004 through May 1, 2005. [Exhibits H-8 at ¶ 13, H-23, H-56 at page 142, line 14 through page 143, line 21]

13.      On April 29, 2004, Allstate posted check number 6223 in the amount of $1,172.00 to policy number 0 37 718093 5/01, which covered the period of May 1, 2004 through May 1, 2005. [Exhibit H-22 at page 11, line 3 through page 13, line 16]

14.    On November 17, 2004, Duke did not owe any money to Allstate for policy number 0 37 718093 5/01. [Exhibit H-22 at page 13, lines 17 through 19]

15.    On November 17, 2004, Allstate did not have a claim against Duke for any monies owed under policy number 0 37 718093 5/01. [Exhibit H-22 at page 13, lines 20 through 23]

16.    On November 17, 2004, Allstate did not have a right to payment against Duke for any monies owed under policy number 0 37 718093 5/01. [Exhibit H-22 at page 13, line 24 through page 14, line 3]

### American Express Blue [Recipient of Voidable § 549(b) Transfer]

17.    Duke contends Account Number 3715-288425-31007 reflects his debt to American Express Blue ("AMEX") [Exhibit H-5 at ¶ 10]

18.    On November 17, 2004, Duke's account balance of $1,468.06 was for charges incurred prior to November 17, 2004. [Exhibits H-4 at ¶ 13, H-24 at p. 8, lines 6 through 15].

19.    Payment by check number 574 dated November 30, 2004 from a Miglin Properties, LLC account signed by Duke in the amount of $29.00 was made to AMEX for Duke's account number 3715-288425-31007, as listed in Duke's Schedule F. Said payment was made subsequent to November 17, 2004 (in December, 2004) for charges incurred prior to and owing as of November 17, 2004. [Exhibits H-4 at ¶ 12, H-8 at ¶ 31, H-24 at page 10, lines 11 through 20, page 11, lines 7 through 11, page 11, lines 14 through 25 and page 12, lines 1 through 22, Exhibit H-56 at page 205, lines 11 through 20]

### American Federation of Television and Radio Artists
### [No Claim and Recipient of Voidable § 549(b) transfer]

20.    Duke contends that Account Number 35801 reflects his debt to American Federation of Television and Radio Artists ("AFTRA"). [Exhibit H-5 at ¶ 15]

21.     A $128.76 payment was made by Duke to AFTRA for Account Number 35801 for the claim listed in Duke's Schedule F. [Exhibits H-26 at page 9, lines 17 through 20, H-4 at ¶ 17]

22.     The $128.76 Duke listed on his Schedule F is for dues billed by AFTRA to Duke on or about November 1, 2004, for the period between November 1, 2004 and April 30, 2005. [Exhibits H-4 at ¶ 18, H-8 at ¶ 16, H-26 at page 10, lines 8 through 10 and page 28, lines 20 through 22]

23.     The due date for the dues for AFTRA listed in Duke's Schedule was December 15, 2004. [Exhibit H-27]

24.     Duke paid AFTRA $128.76 for Account Number 35801 for his membership dues from November 1, 2004 through April 30, 2005 with check number 551 dated November 11, 2004 which was posted December 21, 2004. [Exhibits H-3 at ¶21, H-4 at ¶¶ 21, 22, H-26 at page 28, lines 20 through 25, H-27]

25.     The $128.76 payment covered Duke's membership between November 1, 2004 through November 17, 2004. [Exhibit H-26 at page 28, lines 17 through 25 and page 29, lines 1 through 4]

26.     On November 17, 2004, Duke did not owe any debt to AFTRA. [Exhibit H-26 at page 9, lines 5 through 7]

27.     If Duke did not pay his membership dues, then he simply would not be a member of AFTRA [Exhibit H-26 at page 10, lines 11 through 19]

28.     AFTRA had no claim or right to payment against Duke for any unpaid dues. [Exhibit H-26 at page 9, lines 14 through 16 and page 10, lines 11 through 19]

## AT&T Wireless [Two Accounts Count as Single Creditor
and Recipient of Voidable § 549(b) Transfer]

29.     Duke contends that he has two accounts with AT&T Wireless that count for purposes of this proceeding. [Exhibit H-1 at p.1-2]

30.     The two claims for AT&T Wireless listed by Duke in his Schedule F are for the same creditor and entity – AT&T Wireless. [Exhibits H-3 at ¶ 49, H-8 at ¶ 34, H-28 at page 9, lines 16 through 20]

31.     The invoice for November 16, 2004 (Account No. 0051807373) from AT&T Wireless covered a billing period between October 16, 2004 and November 15, 2004 and shows charges for $67.19. Payment was received for this invoice in the amount of $67.19 on December 5, 2004 and it paid for charges incurred prior to November 17, 2004. [Exhibits H-3 at ¶ 50, H-4 at ¶ 31, H-28 at page 9, line 23 through page 12, line 4]

32.     The invoice for November 21, 2004 (Account No. 0031438103) from AT&T Wireless covered a billing period between October 21, 2004 and November 20, 2004 and shows charges for $48.04. Payment was received for this invoice in the amount of $48.04 on December 5, 2004 and it paid for charges incurred prior to November 17, 2004. [Exhibits H-3 at ¶ 51, H-4 at ¶ 29, H-28 at page 12, line 5 through page 13, line 13, H-29]

### Bottom Line/Personal [No Debt Owed]

33.     Duke contends that Account Number 390904 MGL 0025S097 reflects his debt to Bottom Line/Personal. [Exhibit H-5 at ¶ 35]

34.     Duke paid $29.95 in April, 2004 to Boardroom, Inc. for a full newsletter subscription to Bottom Line/Personal for the period covering May 1, 2004 through April 15, 2005, for the claim listed in Duke's Schedule F. [Exhibit H-4 at ¶¶ 37 and 38, H-8 at ¶ 9, H-30 at page 10, line 23 through page 11, lines 5 through 17]

35.    The payment of $29.95 in April, 2004 was a pre-payment for 24 issues. [Exhibit H-30 at page 19, lines 10 through page 20, line 1 and page 20, lines 8 through 11]

36.    On November 17, 2004, Duke owed no money or debt to Boardroom, Inc. for his subscription to Bottom Line/Personal since his account was paid in April, 2004 through April 15, 2005. [Exhibit H-30 at page 10, line 23 through page 11, line 17 and page 12, lines 11 through 25]

37.    On November 17, 2004, Boardroom, Inc. had no claim or right to payment from Duke for his subscription to Bottom Line/Personal. [Exhibit H-30 at page 12, lines 18 through 21]

### Chicago Sun-Times [No Debt Owed]

38.    Duke contends that Account Number 0930032188 reflects his debt to Chicago Sun Times. [Exhibit H-5 at ¶ 42]

39.    Prior to November 17, 2004, a payment in the amount of $16.56 was made to Chicago Sun-Times for Account Number 0930032188. [Exhibit H-4 at ¶ 44]

40.    The $16.56 payment covered a subscription to the Chicago Sun-Times newspaper that included November 17, 2004. [Exhibits H-4 at ¶ 45, H-32]

41.    On November 4, 2004, a payment in the amount of $16.56 was made to Chicago Sun Times for Account Number 0930032188 that covered Duke's subscription from November 4, 2004 through at least November 23, 2004. [Anticipated Trial Testimony of Linda Loye; Exhibit H-31]

42.    On November 17, 2004, Duke owed no money or debt to the Chicago Sun-Times. [Anticipated Trial Testimony of Linda Loye; Exhibits H-4 at ¶¶ 44 and 45, H-31, H-32]

43.     On November 17, 2004, Chicago Sun-Times had no claim or right to payment from Duke. [Anticipated Trial Testimony of Linda Loye; Exhibits H-4 at ¶¶ 44 and 45, H-31, H-32]

**City of Los Angeles Municipal Services [Recipient of Voidable § 549(b) Transfer]**

44.     Duke contends that Account Number 4-12-16478-00428-00-0000-5-01 reflects his debt to the City of Los Angeles Municipal Services for purposes of this proceeding. [Exhibit H-5 at ¶ 49]

45.     Payment was made to the City of Los Angeles Municipal Services account number 4-12-16478-00428-00-0000-5-01 in the name of Duke subsequent to November 17, 2004 for services provided prior to and owing as of November 17, 2004. [Exhibits H-8 at ¶ 22, H-4 at ¶ 55, H-33]

46.     City of Los Angeles Municipal Services account number 4-12-16478-00428-00-0000-5-01 relates to service at 428 Carroll Canal, Venice, California. [Exhibit H-33]

**Cohon Raizes & Regal, LLP [Insider and Recipient of Voidable § 549(b) Transfer]**

47.     Duke contends that Cohon Raizes & Regal, LLP counts as a creditor for purposes of 11 U.S.C. § 303(b)(2). [Exhibits H-56 at page 92, lines 6 through 13, H-5 at ¶ 58]

48.     Cohon Raizes & Regal, LLP represents Duke in this bankruptcy proceeding. [Exhibits H-4 at ¶ 59, H-8 at ¶ 42, H-34]

49.     Cohon Raizes & Regal, LLP has represented Duke from at least July, 2004 through the present in related litigation involving Hirsch. [Exhibit H-9 at ¶ 1]

50.     Cohon Raizes & Regal LLP appeared on behalf of Duke, and presently represents him in federal district court in this district in case number 04 C 7428, entitled Kathleen Hirsch

v. Duke Miglin and Marilyn Miglin, which action is pending but stayed as to Duke because of this involuntary bankruptcy proceeding. [Exhibits H-4 at ¶ 60, H-8 at ¶ 43]

51.     Cohon Raizes & Regal LLP appeared on behalf of Duke, and presently represents him in Circuit Court of Cook County, State of Illinois court case number 04 L 50730 (consolidated with 04 L 50734 and 04 L 50787), which actions are presently stayed. [Exhibits H-4 at ¶ 61, H-8 at ¶ 44]

52.     Case No. 04 L 50730 (consolidated with 04 L 50734 and 04 L 50787), each entitled Duke Miglin v. Kathleen Hirsch, are proceedings in which Hirsch registered and attempted to enforce her three California judgments against Duke. [Exhibit H-9 at ¶ 2]

53.     Cohon Raizes & Regal LLP received payment on Duke's account after November 17, 2004 for services provided prior to and owing as of November 17, 2004. [Exhibit H-9 at ¶ 3]

### Cole Taylor Bank [Contingent Claim and Excluded by Court Order]

54.     Cole Taylor Bank has been excluded as a creditor for purposes of section 303(b)(2) by court order dated February 14, 2005. [Exhibits H-3 at ¶ 32, H-5 at ¶¶ 65, 70, 72, 73 and 77, H-6 at ¶ 4, H-8 at ¶ 29, H-21]

### Comcast [No Debt Owed]

55.     Duke contends that Account Number 411861601 reflects his debt to Comcast for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 78, H-35 at page 10, lines 15 through 20]

56.     On November 17, 2004, Duke's account with Comcast listed on his Schedule F had a credit balance of $2.13. [Exhibits H-3 at ¶ 30, H-35 at page 10, lines 25 through page 11, line 24, page 13, lines 1 through 6, page 18, lines 22 through 23, and page 20, lines 2 through 6]

57.     The billing period from November 13, 2004 to December 12, 2004 is billed in advance for services not yet rendered because Comcast bills for its services in advance. [Exhibit H-35 at page 23, lines 10 through 19 and page 32, line 24 through page 33, line 2]

58.     On November 17, 2004, Duke owed no money or debt to Comcast and Comcast had no claim or right to payment against Duke. [Exhibit H-35 at page 11, line 25 through page 12, line 3, page 12, lines 14 through 17, and page 33, lines 3 through 11]

### Crain's Chicago Business [No Debt Owed]

59.     Duke contends that Account Number 6507659676 reflects his debt to Crain's Chicago Business for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 85]

60.     As of November 17, 2004, Duke did not owe any money to Crain's Chicago Business, or its publisher, Crain Communications, Inc. [Exhibit H-36 at page 9, line 16 through 18]

61.     The amount of $69.00 listed on Duke's Schedule F represents Duke's subscription fee to Crain's Chicago Business for the period of October 20, 2003 through October 11, 2004. [Exhibits H-1 at p. 3, H-36 at page 9, lines 4 through 13]

62.     On or about October 31, 2003, Crain Communications, Inc. received payment in the amount of $69.00 for Duke's subscription to Crain's Chicago Business, as listed in his Schedule F, for the time period of October 20, 2003 through October 11, 2004. [Exhibit H-3 at ¶ 34, H-8 at ¶ 25]

63.     Duke's subscription to Crain's Chicago Business terminated on October 11, 2004 and was never renewed. The last issue of Crain's Chicago Business sent by Crain Communications, Inc. to Duke occurred on October 25, 2004. [Exhibits H-3 at ¶ 35, H-36 at

page 8, lines 7 through 12, page 9, lines 14 through 15, page 16, lines 14 through 25 and page 17, lines 1 through 12]

64.    On November 17, 2004, Crain Communications, Inc. had no right to payment from Duke or claim against him for his subscription to Crain's Chicago Business. [Exhibit H-36 at page 9, lines 19 through 25]

### Discover Card [Recipient of Voidable § 549(b) Transfer]

65.    Duke contends that Discover Card from Discover Financial Services ("Discover") counts as a creditor for purposes of 11 U.S.C. § 303(b)(2). [Exhibit H-5 at ¶ 91]

66.    On November 21, 2004, Discover received payment in the amount of $20.00 for Account Number 6011 0074 9009 1377 for charges incurred prior to November 17, 2004. [Anticipated Trial Testimony of Audrey Pawlecki, Exhibits H-3 at ¶ 52, H-4 at ¶ 92, H-37, H-38]

### Haight, Brown & Bonesteel, LLP [Insider and Recipient of Voidable § 549(b) transfer]

67.    Duke contends that Haight Brown & Bonesteel, LLP ("Haight") counts as a creditor for purposes of 11 U.S.C. § 303(b)(2). [Exhibit H-5 at ¶ 95]

68.    Haight is a law firm that represented Duke in his appeal of the three judgments entered in favor of Hirsch against Duke in California state court totaling $314,697.50 in 2002 and 2004. [Exhibits H-8 at ¶¶ 37 and 38, H-39, H-40, H-43, H-44]

69.    As of the Petition Date of November 17, 2004, Duke owed $63,318.31 to Haight for representing him against Hirsch in proceedings related to these judgments. [Exhibits H-8 at ¶ 39, H-39]

70.    Haight presently represents Duke in related litigation against Hirsch. [Exhibits H-8 at ¶¶ 40 and 41, H-41, H-42, H-56 at page 86, line 20 through page 87 line 3]

71.    Haight has represented Duke from at least February, 2002 through the present in litigation involving Hirsch. [Exhibits H-3 at ¶ 66, H-9 at ¶ 4, H-41, H-42]

72.    Haight has continued to represent Duke and render legal services to Duke after the Petition Date of November 17, 2004. [Exhibits H-8 at ¶ 41, H-42]

73.    Haight received payment on Duke's account after November 17, 2004 for services provided prior to and owing as of November 17, 2004.  On January 18, 2005, a payment in the amount of $5,000 was credited to Duke's account with Haight for services provided prior to November 17, 2004. [Exhibit H-8 at ¶ 45, H-39, H-56 at page 91 line 23 through page 92, line 5]

### Kathleen Hirsch [Counts as a Creditor]

74.    In 1999, Duke sued Hirsch in Los Angeles County Superior Court, Case No. BC 212860. [Exhibit H-8 at ¶ 6]

75.    In 2002 and 2004, the trial court in California entered three judgments in favor of Hirsch and against Duke for attorney's fees and costs totaling $314,697.50. [Exhibits H-8 at ¶ 7, H-44]

76.    The California judgments for attorney's fees and costs in favor of Hirsch and against Duke were registered in Illinois pursuant to the Illinois Uniform Enforcement of Judgments Act (735 ILCS 5/12-650 *et seq.*):

a.    $210,000 judgment (entered in California on March 5, 2002) on July 9, 2004 in Case Number 2004 L 50730;

b.    $4,403.00 judgment on July 13, 2004 (entered in California on March 5, 2002) in Case Number 2004 L 50734; and

c.    $100,293.00 judgment (entered in California on June 28, 2004) on July 23, 2004 in Case Number 2004 L 50787 (collectively, "the Illinois judgments"). [Exhibits H-8 at ¶ 8, H-3 at ¶ 9, H-45]

77.    In 2003, Duke filed an appeal with the Second Appellate District in California, and the judgment in favor of Hirsch was affirmed. Miglin v. Hirsch, 2003 Cal. App. Unpub. LEXIS 9771 (2nd Dist. Cal. October 15, 2003) as modified on denial of rehearing 2003 Cal. App. Unpub. LEXIS 10658 (2nd Dist. Cal. November 13, 2003). Duke also filed a petition for review with the California Supreme Court, which was denied. Miglin v. Hirsch, 2004 Cal. LEXIS 257 (Cal. January 14, 2004) [Group Exhibit H-43].

78.    Duke does not dispute Hirsch's claim related to her judgments. [Exhibit H-6 at ¶ 6(d)].

### SBC [Recipient of Voidable § 549(b) Transfer]

79.    Duke contends that Account Number 312 944-2626 997 5 reflects his debt to SBC for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 105]

80.    Payment to SBC for Account Number 312 944-2626 997 5 was made subsequent to November 17, 2004 for services provided prior to November 17, 2004. [Exhibit H-4 at ¶ 109]

81.    On November 23, 2004, payment in the amount of $11.63 was made for Duke's account with SBC, Account Number 312 944-2626 997 5, as listed on his Schedule F. This $11.63 payment was applied as follows:  $0.01 was applied to a late charge incurred on November 5, 2004 and $11.62 was applied to charges incurred during the period of November 5, 2004 through December 3, 2004.  [Anticipated Trial Testimony of Laura Lopez; Group Exhibit H-47]

82.    On December 14, 2004, payment in the amount of $11.32 was made for Duke's account with SBC, Account Number 312 944-2626 997 5, as listed on his Schedule F.  Of that payment, $0.14 was applied to a late charge incurred on November 5, 2004. [Anticipated Trial Testimony of Laura Lopez; Group Exhibit H-47]

**Screen Actors Guild [No Claim and Recipient of Voidable § 549(b) Transfer]**

83.    Duke contends that Account Number 00417036 reflects his debt to Screen Actors Guild ("SAG") for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 111]

84.    Duke made a payment to SAG in the amount of $52.00 for the claim listed in his Schedule F, Account Number 00417036, for his membership dues with SAG from November 1, 2004 through April 30, 2005 from his checking account with check number 552 dated November 11, 2004.  The membership dues statement was issued on or about November 1, 2004 and had a payment remittance due date of December 15, 2004.  Duke's payment was received and posted by SAG on December 20, 2004. [Exhibits H-4 at ¶¶ 113, 114 and 115, H-8 at ¶ 26, H-48 at page 12, line 20 through page 13, line 22, H-49]

85.    Duke's membership dues for the period of November 1, 2004 through April 15, 2005 were not due until December 15, 2004. [Exhibit H-3 at ¶ 37; Exhibit H-48 at page 12, lines 10 through 16]

86.    As of November 17, 2004, Duke was a paid member of SAG in good standing. Even if Duke had failed to pay his dues for the period of November 1, 2004 through April 30, 2005, the Screen Actors Guild would not have terminated his membership. [Exhibit H-48 at page 12, lines 1 through 6, page 13, line 23 through page 14, line 23, page 15, lines 16 through 23, page 38, lines 15 through 17]

87.    On November 17, 2004, SAG had no claim or right to payment against Duke for membership dues. [Exhibit H-48 at page 11, lines 12 through 15]

88.    The invoice that was sent to Duke did not need to be paid unless Duke wanted to work under SAG's jurisdiction. [Exhibit H-48 at page 27, line 18 through page 28, line 2]

89.    If Duke did not want to pay the invoice, he would simply be placed on inactive status. [Exhibit H-48 at page 27, lines 18 through 22]

90.    SAG does not file suit to collect past unpaid membership dues. [Exhibit H-48 at page 30, line 24 through page 31, line 3]

### Shell Mastercard (Citibank) [No Debt Owed]

91.    Duke contends that Account Number 51878 2801 4449 8682 reflects his debt to Shell Mastercard (Citibank) for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 121]

92.    Prior to November 17, 2004, a payment was made to Shell Mastercard (Citibank) in the amount of $177.82 for Account number 51878 2801 4449 8682 for the claim listed in Duke's Schedule F. [Exhibits H-3 at ¶ 39, H-4 at ¶ 122]

93.    Payment was made for Duke's Shell MasterCard (Citibank) in the amount of $177.82, Account Number 5187 2801 4449 8682, as listed on his Schedule F, which posted on November 15, 2004, resulting in a credit balance of $17.55 on the account on November 17, 2004. The account statement showed a credit balance of $16.38 as of the Statement/Closing Date of November 26, 2004. [Exhibit H-10 at ¶ 1]

94.    On November 17, 2004, the Shell Mastercard (Citibank) account referred to in Duke's Schedule F had a credit balance of $17.55. [Exhibit H-3 at ¶ 40]

95.    On November 17, 2004, Duke did not owe Shell Mastercard (Citibank) any money or debt. [Exhibits H-10 at ¶ 1, H-3 at ¶ 40; H-50]

96.    On November 17, 2004, Shell Mastercard (Citibank) had no claim or right to payment against Duke.

## SoCal Gas Co. [Recipient of Voidable § 549(b) Transfer]

97.    Duke contends that Account Number 053 003 1559 4 reflects his debt to Socal Gas Co. for purposes of this proceeding. [Exhibits H-1 at p. 3, H-5 at ¶ 126]

98.    On November 29, 2004, a payment in the amount of $12.75 was received and credited by SoCal Gas to Account Number 053-003-1559 in the name of Duke, as listed in his Schedule F, for gas services supplied to 428 Carroll Canal, Venice, California between October 7, 2004 and November 5, 2004. The charges for these gas services were billed on November 8, 2004 and owing as of November 17, 2004. [Exhibits H-4 at ¶ 130, H-10 at ¶ 3, H-51 at ¶ 4]

99.    The payment to Socal Gas Co. made on November 29, 2004 was made with a check signed by Duke. [Exhibit H-52]

100.    On January 6, 2005, a payment in the amount of $51.66 was received and credited by SoCal Gas to Account Number 053-003-1559 in the name of Duke, as listed in his Schedule F, for gas services supplied to 428 Carroll Canal, Venice, California, between November 5, 2004 and December 9, 2004 and billed on December 10, 2004. [Exhibit H-10 at ¶ 4]

101.    The payment to SoCal Gas Co. on January 6, 2005 was made with a check signed by Duke. [Exhibit H-53]

## Suburban Bank & Trust Company [Contingent Claim and Excluded by Court Order]

102.    Suburban Bank & Trust has been excluded as a creditor for purposes of section 303(b)(2) by court order dated February 14, 2005. [Exhibits H-3 at ¶ 43, H-5 at ¶¶ 133, 135, 138, 139, 141, 142, 144, and 145, H-6 at ¶ 4, H-8 at ¶ 30, H-21]

## United Mileage Plus [Recipient of Voidable § 549(b) Transfer]

103.    Duke contends that he is indebted to United Mileage Plus for account number 4388 5230 4119 9808 for purposes of this proceeding. [Exhibits H-1 at p. 4, H-5 at ¶ 146]

104.    Payment was made to United Mileage Plus for Account Number 4388 5230 4119 9808 after November 17, 2004 for charges incurred prior to November 17, 2004. [Exhibits H-4 at ¶ 148, H-54 and Duke Exhibits 37 and 38]

### Western Exterminator Company [Recipient of Voidable § 549(b) Transfers]

105.    Duke contends that he is indebted to Western Exterminator Company ("Western") in connection with account number 98029808-7. [Exhibits H-1 at p. 4, H-5 at ¶ 151]

106.    As of November 17, 2004, there was an account balance of $77.00 due and owing to Western. [Exhibit H-55 at page 11, lines 15 through 24]

107.    The dates of service giving rise to the account balance of $77.00 were November 11, 2004 and November 16, 2004. [Exhibit H-55 at page 11, line 21 through page 12, line 3]

108.    The charges for service on November 11, 2004 and November 16, 2004 were $38.50 each. [Exhibit H-55 at page 12, lines 4 through 7]

109.    Services by Western were provided at 428 Carroll Canal, Venice, California 90291. [Exhibit H-55 at page 12, lines 12 through 14]

110.    Western received two payments for Duke's account:  one on November 30, 2004 and the other on December 20, 2004. [Exhibit H-55 at page 13, lines 1 through 5, page 13, line 13 through page 14, line 15]

111.    The first payment was with a check dated November 19, 2004 in the amount of $38.50 signed by Duke. [Exhibit H-55 and check number 6658 therein]

112.    The second payment was with a check dated December 10, 2004 in the amount of $38.50 signed by Duke. [Exhibit H-55 and check number 6702 therein]

113.    These two payments were applied to the $77.00 account balance owing as of November 17, 2004 for the service charges on November 11, 2004 and November 16, 2004. [Exhibits H-8 at ¶ 11, H-55 at page 13 through page 14, line 2, page 22, lines 10 through 20]

### THE FRAUDULENT LEASE

114.    Duke is a purported tenant at 428 Carroll Canal, Venice, California by virtue of a lease produced in this case by Duke and his mother, Marilyn Miglin ("Marilyn"), which lease they claim was executed on March 28, 1998. [Exhibits H-14 and H-15]

115.    Duke listed the utilities, pest control services and homeowner's insurance for the property located at 428 Carroll Canal, Venice, California 90291 on his Schedule F.  [Exhibits H-14 and H-15]

116.    The lease produced by Duke and Marilyn in this case was not signed on March 28, 1998. [Exhibit H-57]

117.    The lease form Duke and Marilyn allegedly signed on March 28, 1998 did not exist on that date.  [Exhibit H-57]

118.    Duke and Marilyn manufactured the lease to deceive petitioning creditor and this Court into believing that Allstate Insurance Company, Comcast, SoCal Gas Company, Los Angeles Municipal Services and Western Exterminator Company are creditors of Duke. [Exhibits H-1, H-2, H-14, H-15, H-57]

119.    No tax returns were filed by the Marilyn Miglin Qualified Personal Residence Trust or Marilyn Miglin which report the income, deductions and credits for the property located at 428 Carroll Canal, Venice, California 90291 from 1998 to the present.  [Exhibit H-11].

## DUKE DID NOT "BORROW" MONEY FROM MIGLIN PROPERTIES, LLC BECAUSE HE CONTROLS AND OWNS ONE-THIRD OF IT

120.    Duke is a one-third owner of Miglin Properties, LLC, the entity he claims to have borrowed money from to pay his Schedule F creditors.

121.    Duke controls Miglin Properties, LLC and has unfettered discretion to its checking account funds to pay his creditors.

122.    One-third of the money Duke claims to have borrowed from Miglin Properties, LLC belongs to Duke because he is a one-third owner.

## IF DUKE "BORROWED" MONEY FROM MIGLIN PROPERTIES, LLC, THOSE FUNDS WERE GENERALLY AVAILABLE TO HIM TO PAY HIS CREDITORS WITHOUT ANY RESTRICTION WHATSOEVER

123.    Duke's sister, Marlena Miglin ("Marlena"), Marilyn, and Duke are each one-third owners of Miglin Properties, LLC.

124.    Marlena and Marilyn have no responsibilities in the management of Miglin Properties, LLC.

125.    Duke manages and controls all of the affairs of Miglin Properties, LLC.

126.    Marlena and Marilyn are not aware of Duke's duties in the management of Miglin Properties, LLC.

127.    Marlena, Marilyn and Duke are the only signatories on Miglin Properties, LLC's checking account.

128.    Marlena is not aware that Duke wrote checks on Miglin Properties, LLC's checking account to pay his creditors.

129.    Marlena is not aware that Duke borrowed money from Miglin Properties, LLC to pay his creditors.

130.    Marlena is not aware of any promissory notes Duke executed for the loans he purportedly made to himself from Miglin Properties, LLC.

131.    Marlena and Marilyn had no input into drafting or preparing any of the promissory notes and have no idea who prepared the promissory notes.

132.    Marlena and Marilyn do not know if any of the promissory notes have been repaid.

133.    Marlena and Marilyn do not know if any of the promissory notes have been assigned or forgiven.

134.    Marlena and Marilyn do not know who negotiated the terms of the promissory notes, including the interest rates, the amounts and maturity dates.

135.    Marlena and Marilyn do not know if any legal action has been taken against Duke to collect the notes.

136.    The Miglin Properties, LLC Operating Agreement requires at least 50% of the member interests to approve loans to others. [Exhibit H-16]

137.    Marlena does not recall ever approving any loans to Duke to pay his creditors.

138.    Marilyn does not recall Duke discussing the promissory notes prior to the time he "borrowed" money from Miglin Properties, LLC.

139.    Marilyn is not aware of checks Duke wrote on the Miglin Properties, LLC checking account.

140.    Duke did not discuss each check with Marilyn before he paid his creditors.

## THE FUNDS DUKE "BORROWED" FROM MARILYN MIGLIN (OR THE MARILYN MIGLIN TRUST) WERE GENERALLY AVAILABLE TO HIM TO PAY HIS CREDITORS WITH NO RESTRICTION WHATSOEVER

141.    Duke has general authority to draw on the Marilyn Miglin Trust checking account to pay his personal creditors.

142.    Duke is a beneficiary of the Marilyn Miglin Trust. [H-13]

143.    Duke, Marilyn and Marlena are the only signatories on Bank One Account number 652336991.

144.    Duke did not consult with Marilyn or Dennis Carlin, the co-trustees of the Marilyn Miglin Trust, every time he paid his personal bills with the Marilyn Miglin Trust account funds.

145.    Marilyn does not know if Duke executes a promissory note every time he borrows money from her.

146.    Marilyn is not aware of any restrictions on the money Duke borrows from her.

147.    Marilyn is not aware of any specific procedure Duke follows if he wants to write checks from her trust account to pay his debts.

148.    Marilyn had no input in drafting or preparing any of the promissory notes and does not know who prepared them.

149.    Marilyn does not know if any of the promissory notes have been repaid.

150.    Marilyn does not know if any of the promissory notes have been assigned or forgiven.

151.    Marilyn does not know who negotiated the terms of the promissory notes, including the interest rates, the amounts and maturity dates.

152.    Marilyn does not know if any legal action has been taken to collect the notes.

## CONCLUSIONS OF LAW

1.      Section 303(b) to Title 11 of the United States Bankruptcy Code[1] provides, in

pertinent part:

> An involuntary case against a person is commenced by the filing with the
> bankruptcy court of a petition under chapter 7 or 11 of this title –
>
> (1) by three or more entities, each of which is either a holder of a claim against
> such person that is not contingent as to liability or the subject of a bona fide
> dispute, or an indenture trustee representing such a holder, if such claims
> aggregate at least $ 12,300 more than the value of any lien on property of the
> debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of
> such person and any transferee of a transfer that is voidable under section 544,
> 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that
> hold in the aggregate at least $ 12,300 of such claims.

2.      To be an eligible creditor to file an involuntary petition, one's "claim" cannot be

contingent as to liability or subject to a bona fide dispute. See Section 303(b). See also COLLIER

ON BANKRUPTCY, § 303.04[1] (15th ed. rev. 2004).

3.      Under section 303(b)(2), if a debtor has fewer than twelve creditors, one creditor

can file the involuntary petition. In re Crain, 194 B.R. 663, 666 (Bankr. S.D. Ala. 1996).

4.      The number of creditors is determined on the date the involuntary petition is filed.

In re Atwood, 124 B.R. 402, 406 (Bankr. S.D. Ga. 1991).

5.      In determining if there are twelve or more creditors, a creditor will not be counted

for purposes of section 303(b)(2) if the creditor is an employee or an insider of the debtor, or if

the creditor received a transfer voidable under 11 U.S.C. § 544, 545, 548, 549, or 742(a). Section

303(b)(1) and (2); In re Crain, 194 B.R. at 666.

6.      A debtor's transfers which occur during the "involuntary gap" period (the time

between the filing of the involuntary petition and the order for relief being entered) are avoidable

if made in satisfaction of pre-petition obligations. In re International Teldata Corporation, 12

B.R. 879, 882 (Bankr. D. Nev. 1981) (transferees who receive transfers from debtor between the

time involuntary petition is filed and an order of relief is entered do not count as creditors for

purposes of section 303(b)(2)); COLLIER ON BANKRUPTCY, § 549.03[1]–[2] (15th ed. rev. 2004);

In re Evans, 1997 Bankr. LEXIS 1073, at *17-19 (Bankr. E.D. Va. June 6, 1997); In re Skye

Marketing Corporation, 11 B.R. 891, 899 (Bankr. D. N.Y. 1981) (entities holding claims for pre-

petition debt paid by the debtor after the petition is filed are excluded from the count as creditors

under section 303(b)(2)).

7.      The only creditors that count under section 303(b)(2) are those creditors that

would qualify as petitioning creditors. In re Eastown Auto Co., 215 B.R. 960, 965 (Bankr. App.

Panel 6th Cir. 1998).


## Hirsch is a proper petitioning creditor

8.      Hirsch is a proper petitioning creditor since she is a judgment creditor with three

judgments that cannot be appealed any further.  These judgments are neither the subject of a

*bona fide* dispute, In re Everett, 178 B.R. 132, 140 (Bankr. N.D. Ohio 1994) (unstayed, final

judgments are not subject to a bona fide dispute), nor contingent as to liability.  Duke does not

contest the judgments against him.


## Cole Taylor Bank and Suburban Bank and Trust Company Are Excluded

9.      By court order dated February 14, 2005, Cole Taylor Bank and Suburban Bank

and Trust Company have been excluded as possessing contingent claims.

---

[1] All references to "Sections" refer to the United States Bankruptcy Code unless otherwise indicated.

**Two Accounts for AT&T Wireless Can Only Count as Single Creditor**

10.     The two accounts listed on Duke's Schedule F for AT&T can only count as a single creditor.  If one entity has multiple claims, that entity is only counted once.  See In re Evans, 1997 Bankr. LEXIS 1073, *10 (Bankr. E.D. Va. June 6, 1997).

**Cohon Raizes & Regal, LLP and Haight Brown & Bonesteel, LLP
are Excluded as Insiders**

11.     Section 303(b)(2) excludes counting "insiders" for purposes of determining the number of creditors as of the Petition Date.

12.     An "insider" is defined in Section 101(3). The legislative history provides that an "insider" is a person or entity with "a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny that those dealing at arms length with the debtor."  In re Rimell, 111 B.R. 250, 254 (Bankr. E.D. Mo. 1990) (*citing* S. Rep. No. 95-989, 95th Cong. 2d Sess., *reprinted in* 1978 U.S. Code Cong. & Admin. News, pp. 5787, 5810)

13.     "Both the statute and legislative history indicate that an insider may be someone who currently enjoys a fiduciary relationship with the debtor." In re Rimell, 111 B.R. at 254.

14.     "[T]he definition of an 'insider' provided in § 101(3) shall include an attorney who is owed money from a client who is currently defending the client in an involuntary bankruptcy petition." Id.

15.     An insider is also an attorney who presently represents the debtor in related litigation. Id.

16.     Cohon represents Duke in related state and federal court proceedings and in this involuntary proceeding.  Therefore, Cohon is excluded as a creditor of Duke for purposes of Section 303(b)(2) because it is an insider.

17.    Haight has continuously represented Duke from February, 2002 through the present (including as of the Petition Date) in litigation related to Hirsch. It currently represents Duke in California state court proceedings to modify and satisfy Hirsch's judgments which form the bases for her claim. As a result, Haight is excluded as a creditor of Duke for purposes of Section 303(b)(2) because it is an insider.

### AFTRA and SAG Do Not Count as Creditors of Duke Because They Were Not Holders of a Claim on the Petition Date as Defined by Section 101(5)

18.    In order to count as a creditor, one must hold a claim against the debtor as of the Petition Date. See Section 303(b).

19.    A claim is defined as a right to payment or right to an equitable remedy for a breach that gives rise to a right to payment. See Section 101(5).

20.    AFTRA did not hold a claim against Duke as of the Petition Date.

21.    AFTRA does not count as a creditor of Duke for purposes of Section 303(b)(2).

22.    SAG did not hold a claim against Duke as of the Petition Date.

23.    SAG does not count as a creditor of Duke for purposes of Section 303(b)(2).

### Allstate, Bottom Line/Personal, Chicago Sun-Times, Comcast, Crain's Chicago Business and Shell Mastercard are Excluded as Creditors Because Duke Did Not Owe Them Any Money or Debt As Of the Petition Date.

24.    Allstate does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Allstate any money or debt on the Petition Date and Allstate held no claim against Duke on the Petition Date

25.    Bottom Line/Personal (Boardroom, Inc.) does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Bottom Line/Personal (Boardroom,

Inc.) any money or debt on the Petition Date and Bottom Line/Personal (Boardroom, Inc.) held no claim against Duke on the Petition Date.

26.     Chicago Sun-Times does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Chicago Sun-Times any money or debt on the Petition Date and Chicago Sun-Times held no claim against Duke on the Petition Date.

27.     Comcast does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Comcast any money or debt on the Petition Date and Comcast held no claim against Duke on the Petition Date.

28.     Crain's Chicago Business (Crain Communications, Inc.) does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Crain's Chicago Business (Crain Communications, Inc.) any money or debt on the Petition Date and Crain's Chicago Business (Crain Communications, Inc.) held no claim against Duke on the Petition Date.

29.     Shell Mastercard (Citibank) does not count as a creditor of Duke for purposes of Section 303(b)(2) because Duke did not owe Shell Mastercard (Citibank) any money or debt on the Petition Date and Shell Mastercard (Citibank) held no claim against Duke on the Petition Date.

### AMEX, AFTRA, AT&T Wireless, City of Los Angeles Municipal Services, Cohon, Discover Card, Haight, SBC, SAG, SoCal Gas Co., United Mileage Plus and Western Exterminator Are Excluded as Recipients of Section 549(b) Voidable Post-Petition Transfers

30.     Pursuant to Section 303(b)(2), transferees who receive transfers that are voidable under section 549 are not included in determining the number of Duke's creditors. Transfers that occur after the commencement are voidable pursuant to Section 549(b) if they satisfy debt that

arose pre-petition. See Section 549(b); COLLIER ON BANKRUPTCY, § 549.03[1]–[2] (15th ed. rev. 2004); In re Evans, 1997 Bankr. LEXIS 1073, at *17-19 (Bankr. E.D. Va. June 6, 1997); In re International Teldata Corporation, 12 B.R. 879, 882 (Bankr. D. Nev. 1981) (transferees who receive transfers from debtor between the time involuntary petition is filed and an order of relief is entered do not count as creditors for purposes of section 303(b)(2)); In re Skye Marketing Corporation, 11 B.R. 891, 899 (Bankr. D. N.Y. 1981) (entities holding claims for pre-petition debt paid by the debtor after the petition is filed are excluded from the count as creditors under section 303(b)(2)).

31.   Section 549(b) provides for the avoidance of post-commencement payment of pre-petition debt. In re Ford Dodge Creamery Co., 121 B.R. 831, 835 (Bankr. N.D. Iowa 1990).

32.   In determining the date of payment, the date a check is written or mailed is irrelevant since the transfer occurs when the check is honored. In re Oakwood Markets, Inc., 203 F.3d 406, 409 (6th Cir. 2000) (citing Barnhill v. Johnson, 503 U.S. 393 (1992)).

33.   AMEX does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

34.   AFTRA does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

35.   AT&T Wireless does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

36.   City of Los Angeles Municipal Services does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

37.   Cohon does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

38.    Discover Card does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

39.    Haight does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

40.    SBC does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

41.    SAG does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

42.    SoCal Gas Co. does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

43.    United Mileage Plus does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

44.    Western Exterminator does not count as a creditor of Duke for purposes of Section 303(b)(2) because it received a transfer voidable pursuant to Section 549(b).

**The Funds Duke Used for Post-Petition Transfers to AMEX, AFTRA, AT&T Wireless, City of Los Angeles Municipal Services, Cohon, Discover Card, Haight, SBC, SAG, SoCal Gas Co., United Mileage Plus and Western Exterminator are Property of the Estate**

45.    Borrowed funds are "property of the estate." In re Smith, 966 F.2d 1527, 1533 (7th Cir. 1992); In re Jaggers, 48 B.R. 33, 36-36 (Bankr. W.D. Tex. 1985) ("[I]f the funds are available for payment to the creditors of the debtor generally the funds are an asset of the estate and payment thereof constitutes a diminution of the estate.").

46.    The dispositive factor is the debtor's control over the funds. In re Network 90 Degree, Inc., 126 B.R. 990, 995 (N.D. Ill. 1991).

47.     Duke personally signed each post-petition payment to AMEX, AFTRA, AT&T Wireless, City of Los Angeles Municipal Services, Cohon, Discover Card, Haight, SBC, SAG, SoCal Gas Co., United Mileage Plus and Western Exterminator that he allegedly "borrowed" and he had complete control over those funds.

48.     Property of the estate also consists of all legal or equitable interests Duke had in property as of the Petition Date. See Section 541(a)(1).

49.     As a one-third owner of Miglin Properties, LLC, Duke had a legal and/or equitable interest in the funds he used from the Miglin Properties, LLC checking account to make post-petition payments to his personal creditors.

50.     As a beneficiary of the Marilyn Miglin Trust, Duke had a legal and/or equitable interest in the funds he used from the Marilyn Miglin Trust checking account to make post-petition payments to his personal creditors.

51.     Duke had a legal or equitable interest in the funds he used for post-petition payments to AMEX, AFTRA, AT&T Wireless, City of Los Angeles Municipal Services, Cohon, Discover Card, Haight, SBC, SAG, SoCal Gas Co., United Mileage Plus and Western Exterminator.

52.     The funds Duke used for the post-petition payments to AMEX, AFTRA, AT&T Wireless, City of Los Angeles Municipal Services, Cohon, Discover Card, Haight, SBC, SAG, SoCal Gas Co., United Mileage Plus and Western Exterminator are property of the estate as defined by Section 541.

## Conclusion

53.    As of the Petition Date, Duke had less than twelve creditors for purposes of Section 303(b)(2) and Hirsch's involuntary petition is proper.

54.    Duke's motion to dismiss and amended motion to dismiss should be denied as to the issue of whether Duke had 12 or more creditors on the Petition Date.

Respectfully submitted,

KATHLEEN HIRSCH

By: _____
One of Her Attorneys

Joel L. Lipman
Brian M. Dougherty
O'ROURKE KATTEN & MOODY
161 N. Clark Street, Suite 2230
Chicago, Illinois 60601
(312) 849-2020